**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                    CRIMINAL NO.4:10-cr-24-DCB-FKB

**GUILLERMO JOSE PADILLA a/k/a**
**JULIO CESAR FLORES**

<u>**ORDER**</u>

This cause is before the Court on Defendant Guillermo Jose Padilla's Motion to Suppress [docket entry no. 12]. Having duly considered the Motion, responses thereto, the evidence developed at an evidentiary hearing held by the Court, and the applicable statutory and case law, the Court holds as follows:

### I.  Procedural History

Defendant, Guillermo Jose Padilla, was indicted on October 20, 2010 for one count of possession of child pornography, in violation of 18 U.S.C. § 2254(a)(4)(B). The pornography was found on a laptop computer following a roadside search of Padilla's vehicle. After Defendant filed the instant Motion to Suppress the computer as obtained pursuant to an illegal search, the Court held an evidentiary hearing to develop the facts regarding the stop and search. Trial in this matter is currently scheduled for the term of court to begin June 4, 2011.

### II.  Facts

This case arises out of a roadside stop of a vehicle owned by the Defendant, Guillermo Jose Padilla, aka Julio Cesar Flores, on

August 3, 2009 around 5:00 p.m.[1] Padilla was the passenger in a Lincoln Navigator that he owned, as it traveled along I-20 in Lauderdale County.  Inmer Guzman was driving Padilla's vehicle. Lauderdale County Sheriff's Officer Kenneth Delaney was parked on the side of I-20 as the Navigator passed and he observed that it had a temporary paper license tag but that he could not read certain characters on the tag.  Officer Delaney began to follow the Navigator in an attempt to read the license tag.  As he did so, he observed the Navigator cross over the white line on the right side of the road and onto the shoulder.  Because crossing the white line is careless driving, a traffic violation, Officer Delaney turned on his flashing lights and pulled the vehicle over.

The camera mounted inside Delaney's patrol vehicle was activated when he turned on his lights and thus recorded the entirety of the stop.  Once the Navigator and the patrol car were stopped on the shoulder of the interstate, Delaney approached the Navigator from the passenger side and asked Padilla and Guzman for identification.  Both men produced identification, though Padilla's identified him as Julio Cesar Flores.  Delaney asked Guzman to exit the vehicle and then proceeded to issue Guzman a warning for careless driving while Delaney and Guzman were both standing near the rear of the vehicle.

---

[1] These facts are derived from the evidentiary hearing and from the Court's review of a video of the traffic stop.

While issuing the warning, Delaney asked Guzman where and why he was traveling.   Guzman said that he was traveling for work, coming from North Carolina, had stopped in Atlanta and was going to Dallas.   Delaney asked what kind of work he did and Guzman replied that it was construction.   Delaney then approached the passenger side of the vehicle where Padilla was sitting and asked the same questions.   Padilla responded similarly, though, he said that they had been in Atlanta for one day while Guzman had said two days. Padilla also mentioned to Delaney that he had been visiting his brother in Atlanta, which Delaney thought strange because Guzman had said they were working in Atlanta.   After questioning both men, Delaney asked them to wait and returned to his patrol vehicle to run a check on the names the men had given him.   Delaney called the names into the Blue Lightning Operation Centers ("BLOC"), a division of the United States Immigration and Customs Enforcement Agency.

Before Delaney called the names into BLOC, he turned off the audio function on the camera in his patrol vehicle, as he always does, to protect the security of his password.   While BLOC was checking the names, Delaney returned to the passenger side of the vehicle to talk to Padilla.   Delaney testified at the evidentiary hearing that because of Padilla and Guzman's conflicting accounts of their itinerary and the type of vehicle as compared to their stated purpose of working construction, Delaney suspected criminal

activity.   He therefore requested Padilla's consent to search the
vehicle.   Delaney testified that Padilla consented to a search of
the vehicle but Padilla disputes that he consented and because the
audio was turned off, the exchange is not audible on the video.
Delaney then asked Padilla to exit the vehicle, which Padilla did.
Delaney next called a fellow Sheriff's Officer to assist in the
search and returned to his vehicle to retrieve a flashlight.   At
that point, Officer Delaney realized that the audio was off on his
dashboard camera and turned it back on.   He then returned to the
Navigator and began searching it.   Soon after he began the search,
Delaney received a return call from BLOC which informed him that
Guzman's identification had been verified and his record was clear
but that they could not confirm Padilla's identity (though at that
point, Padilla had identified himself as Flores, so the checks were
for that name).   Delaney asked Padilla for a social security card,
so that he could give BLOC that number in an effort to verify his
identity, but Padilla told the Officer that he did not have the
card and could not remember his social security number.

Delaney then began searching the Navigator at the front
passenger door of the vehicle where he immediately noticed what he
described as after-market wiring behind the glove compartment.
Delaney believed the wiring indicated a device installed somewhere
in the dash of the vehicle.   Delaney then asked Guzman and Padilla
what was the purpose of the wiring and they responded nothing.

4

Soon thereafter, another Sheriff's Officer, Chris Fagan, arrived and began to assist with the vehicle search.  The two officers then continued to search the vehicle for approximately one hour on the side of the road, systematically removing much of the cargo in the vehicle.  During the search, Delaney can be heard saying "it's in here somewhere,"  which he testified meant that he believed that contraband was somewhere in the vehicle because he was convinced that criminal activity was afoot.  At some point during the search, Officer Delaney found a receipt from Tampa, Florida dated three days prior, which Delaney believed contradicted Padilla's and Guzman's accounts that they were traveling from North Carolina and Atlanta.  Delaney then confronted Padilla with the receipt and Padilla said that he and Guzman had been in Florida before they had been in North Carolina and then Atlanta.  Padilla attempted to confer with Guzman about their travel itinerary but Delaney interrupted them, saying "just stop."  Delaney was convinced that Padilla and Guzman had lied about their itinerary and were continuing to lie.

Officers Delaney and Fagan continued searching the vehicle on the side of the road and eventually located an after-market tracking device behind the glove compartment.  A tracking device transmits the location of a vehicle to another location, typically using cellular phone and GPS technology.  Officer Delaney testified that in his experience, tracking devices are used in transporting

narcotics so that someone outside the vehicle can keep track of narcotics deliveries and also be aware if the vehicle is stopped for a significant period of time, such as by police.   Delaney admitted on cross-examination that used car dealers also use after-market tracking devices in the event that they need to locate a car to repossess it.   At some point during the roadside search, Officer Delaney found bolts in the vehicle that appeared to have been removed and then painted back over, suggesting a hidden compartment.   Ultimately, after the Officers had searched the vehicle on the side of the road for approximately one hour, Officer Delaney determined based on the totality of the circumstances that he had probable cause to continue searching the vehicle at a second location where he could put it on a rack to inspect its underside for a suspected hidden compartment that might contain contraband.

Officer Delaney informed Padilla that he was going to take the vehicle to the Lauderdale County barn to further search it. Padilla protested and told Delaney that he did not want to go to the barn but Delaney told him that the had no choice.   Padilla rode to the barn in Delaney's vehicle but Delaney did not handcuff Padilla and testified that he did not place Padilla under arrest. Guzman followed Delaney's patrol car in the Navigator to the county barn, which was approximately 15 minutes from the location of the roadside search.

As indicated on the video of the stop, the group arrived at

6

the car barn approximately one hour and twenty minutes after
Delaney initially stopped Padilla's vehicle, around 6:20 p.m.  At
the barn, the Officers began preparing to put the vehicle on a rack
so that they could inspect its underside and search for the
suspected hidden compartment.  At that point, Officer Fagan showed
Delaney some card stock that Fagan had seen on the side of the road
but Delaney had not.  Delaney then realized that he had seen an
embossing machine in the vehicle on the side of the road but had
not realized what it was.  Once Delaney saw the card stock, he
realized that the machine he had seen was an embosser and Delaney
began to suspect that Padilla and Guzman were involved in credit
card fraud or in making fraudulent identification cards.  Officer
Delaney next called Secret Service Agents in Jackson, Mississippi
to request their assistance because of their expertise in credit
card fraud.  The Secret Service Agents advised Delaney that they
would like to interview Padilla and Guzman and would travel from
Jackson to Lauderdale County to do so.

Officers Delaney and Fagan then determined that they should
transport Padilla and Guzman to their office at the East
Mississippi Drug Task Force to wait for the Secret Service agents
because there was no place for them to sit at the barn.  Officer
Delaney could not recall whether he ever placed the Navigator on
the rack at the barn to search for a hidden compartment.  Though
Padilla and Guzman were never formally arrested, Officer Delaney

testified that he would not have permitted them to leave the barn or the Task Force Office if they had asked to do so.  Moreover, Officer Delaney testified that both men were handcuffed once they arrived at the Task Force Office because that was Office protocol when leaving suspects unattended.  While waiting for the Secret Service Agents to arrive, Officer Delaney removed the embossing machine, the card stock, and a laptop computer from Padilla's vehicle and brought it into the office.  Delaney did not turn on the computer.

Secret Service Special Agent Brian Hunter testified at the evidentiary hearing.  He testified that he received a call from his supervisor, Special Agent Allen Bryant, at approximately 7:00 p.m. on the evening of August 3, 2010.  Special Agent Bryant told Hunter that they needed to travel to Lauderdale County from Jackson at the request of Officer Delaney.  Special Agents Bryant and Hunter met up in Jackson at around 8:00 pm and traveled to Lauderdale County, where they arrived at 10:00 or 10:30 p.m.  When Hunter and Bryant arrived, they found Padilla and Guzman separated into different rooms.  The Agents interviewed Padilla first, with the less experienced Hunter handling the preliminary questions and the more senior Bryant handling the bulk of the interview.  Before beginning the interview, Hunter gave Padilla a written document explaining his Miranda rights which Padilla signed indicating that: "I have read this statement of my rights and it has been read to me, and I

understand what my rights are." During the interview, Bryant asked Padilla why he had the embossing machine and Padilla explained that he used it to make ID cards for his construction employees. Padilla told Special Agent Bryant that he had an ID-creation program on his laptop computer which he could show to confirm that he used the embossing machine for his business. Special Agent Hunter then retrieved the computer from Officer Delaney and returned to the room where Padilla was being interviewed. Before opening the laptop, Special Agent Hunter gave Padilla a "consent to search" form, which Padilla signed. That form indicated that "this written permission is given by me voluntarily" and that "I have not been threatened, placed under duress or promised anything in exchange for my consent." It further indicated that "I understand that I may withdraw my consent at any time for any reason. I may also ask for receipts for all things taken." Special Agent Hunter testified that Padilla was not handcuffed during his interrogation.

Special Agent Bryant then sat next to Padilla with the computer and turned it on, so that Padilla could see the screen. Padilla opened up the program he claimed to use to make the construction ID's. Bryant asked Padilla to show him an example ID but Padilla said that he usually deleted them after he made them. Bryant then asked if some deleted ID's might be in the computer's Recycle Bin. Bryant then opened the Recycle Bin and Agents Hunter and Bryant looked at the file names and saw video files with the

name "six-year-old girl" and "twelve-year-old girl."  Bryant then opened one of the files and saw a freeze frame of a young girl.  At that point, the Agents stopped searching the computer and told Padilla that they would not return it to him because it contained contraband (the child pornography).  Padilla was later indicted for possession of child pornography as a result of the seizure of his computer.

### III.  Analysis

Padilla argues that the computer should be suppressed on several grounds: (1) Officer Delaney did not have valid grounds to stop Padilla's vehicle under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968) and thus the results of the roadside search, the search at the county barn, and the search of Padilla's computer were all fruit of the poisonous tree; (2) Padilla did not consent to the initial roadside search of the vehicle and because there was neither reasonable suspicion nor probable cause to search the vehicle, everything obtained as a result of the roadside search is the fruit of the poisonous tree and must be excluded; (3) even if Padilla consented to the roadside search, the consent was not given freely and voluntarily; and (4) Padilla was arrested without probable cause and the vehicle was relocated to the county barn without consent or probable cause and thus his written consent to search the computer was tainted and is not valid.  The Court will address these arguments in turn.

## A.   The Initial Stop

Officer Delaney testified at the evidentiary hearing that he stopped the Lincoln Navigator being driven by Guzman for careless driving after he observed it cross over the white line on the right side of the road.   The Court agrees with the Government that the stop here was justified.   "A police officer may stop a vehicle if he has probable cause to believe a traffic violation has occurred." United States v. Cole, 444 F.3d 688, 689 (5th Cir. 2006) (citing Whren v. United States, 517 U.S. 806, 810 (1996)).   A traffic violation justifies a stop even if that is not the "real reason" for the stop.   Id.   Here, careless driving is a traffic violation under Mississippi law.   Miss. Code Ann. § 63-3-1213.   Accordingly, Officer Delaney's stop of Padilla's vehicle was valid.

## B.   The Roadside Search

Padilla also challenges the roadside search of his vehicle, arguing that it was undertaken without probable cause or consent and, in the alternative, that his consent was not voluntarily and freely obtained.   Officer Delaney testified at the evidentiary hearing that he sought permission from Padilla to search the vehicle and that Padilla agreed.   Though the majority of the activity that occurred during the roadside search was captured by the dashboard camera in Delaney's patrol car, Delaney had turned off the audio function on the camera when he asked for Padilla's consent and thus the alleged consent is not audible.   Nevertheless,

based on the remainder of the video and on  Officer Delaney's testimony, the Court finds that Padilla did consent to the roadside search.   First, Officer Delaney was entirely credible on the witness stand when he testified that Padilla consented to the search but it was not captured on the video only because Officer Delaney had turned off the audio before calling BLOC pursuant to standard procedure to protect his password.   Further, Delaney testified that when he realized he had not captured the consent, he attempted to confirm Padilla's consent for the purposes of the video.   Officer Delaney can be heard on the video saying "you already said that we could look [in the vehicle]."   Padilla did not object or protest when Officer Delaney restated Padilla's consent nor when Delaney proceeded to open the vehicle and begin the search.   The Court is persuaded that Delaney was truthful and that Padilla consented to the search on the roadside, though it was not captured on the video.

     As to Padilla's argument regarding the validity of the consent, the Court finds that Padilla's consent to search the vehicle was valid.   To be valid, a consent to search must be voluntary.   United States v.  Shabazz, 993 F.2d 431, 438 (5th Cir. 1993).[2]   To determine whether the consent was voluntary, a court

_____

     [2] As will be addressed in further detail below, where the consent follows a constitutional violation, the Court must also consider whether the consent was an independent act of free will, an analysis that turns on the causal relationship between the initial violation and the consent.   United States v. Jenson, 462

must consider: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.  <u>Id.</u>

Here, the Court finds that Padilla was not free to leave at the point at which he consented to the search (approximately twenty minutes after the vehicle was stopped) because Delaney was holding him and Guzman pending the return of the license checks from BLOC. The Fifth Circuit has repeatedly held that a roadside stop based on reasonable suspicion may continue until all computer checks come back clear.  <u>E.g.</u>, <u>United States v. Jenson</u>, 462 F.3d 399, 404 (5th Cir. 2006)(citing <u>United States v. Lopez-Moreno</u>, 420 F.3d 420, 430 (5th Cir. 2005)).  Further, there is no evidence regarding Padilla's awareness that he could refuse to consent to the roadside search but the Court notes that neither the videotape nor the testimony indicates that Officer Delaney specifically informed Padilla that he had the right to refuse the search.  These two factors thus weigh against a finding of voluntariness.

However, none of the other factors suggest that the consent was not voluntary.  Officer Delaney's behavior was not coercive — his voice was calm and his demeanor was respectful throughout his

F.3d 399, 407 (5th Cir. 2006).

questioning of Padilla and Guzman.   Moreover, Padilla was cooperative and peaceful in his dealings with Officer Delaney. With regard to Padilla's belief that no incriminating evidence would be discovered, that factor militates in favor of voluntariness here.   It seems unlikely that a roadside search of a vehicle would result in a search of a laptop computer in the vehicle that would reveal child pornography.   Padilla did not testify at the evidentiary hearing but given the circumstances of this particular search and the contraband that was ultimately discovered, the Court finds it unlikely that Padilla believed the pornography would be found.   Lastly, there is no evidence on the record regarding Padilla's education or level of intelligence and thus the Court finds that factor to be neutral.   (Though it is apparent from the video that Padilla is not a native English speaker, he did not seem to have any difficulties communicating with Officer Delaney in the video of the roadside stop and thus the Court does not find that the possible language barrier was of any effect).   For all of these reasons, the Court finds that Padilla's roadside consent to search the vehicle was voluntary.

**C.   Padilla's Consent to Search the Computer**

Padilla next argues that his written consent to search the computer was not valid because it followed on the heels of an arrest and search without probable cause.   Before determining whether Padilla's written consent to search the computer was valid,

14

the Court must first determine whether Padilla is correct that the county barn search was conducted without probable cause and that Padilla was arrested without probable cause.  Because the Court finds that Padilla was arrested without probable cause and that arrest tainted his written consent, it does not reach the question of whether the continued search of his vehicle at the county barn was lawful.

    1.  *Arrest of Padilla at the Task Force Office*

It is unclear from the papers whether the Government disputes that Padilla was arrested; however, Officer Delaney testified at the evidentiary hearing that he never placed Padilla under arrest. Regardless of whether Delaney believed that he had arrested Padilla or formally told Padilla that he was "under arrest," Padilla was arrested.  "Police detention constitutes an 'arrest,' such that it must be accompanied by probable cause, if a reasonable person in the suspect's position would understand the situation to be a restraint on freedom of the kind that the law typically associates with a formal arrest."  Freeman v. Gore, 483 F.3d 404, 413 (5th Cir. 2007)(citing United States v. Corral-Franco, 848 F.2d 536, 540-41 (5th Cir. 1988); United States v. Bengivenga, 845 F.2d 593, 596-97 (5th Cir. 1988)).  Officer Delaney testified that Padilla and Guzman were both handcuffed once they were transported to the Task Force Office because that is the required procedure when an Officer leaves a suspect unattended.  Moreover, Officer Delaney

testified that he would not have let Padilla leave even if he had asked to do so once the embossing machine and card stock were found.  The Court finds that a reasonable person would believe he was under arrest and not free to leave if transported from his vehicle to a Sheriff's office and handcuffed for several hours. United States v. Zavala, 541 F.3d 562, 579-80 (5th Cir. 2008)(holding Terry detention morphed into arrest when exceeded 90 minutes, suspect was handcuffed, placed in a police car, transported to different locations, and not free to leave).  The fact that Delaney never announced to Padilla that he was under arrest is irrelevant.

"Under the Fourth Amendment, a warrantless arrest must be based on probable cause."  Id. at 575 (citing United States v. Castro, 166 F.3d 728, 733 (5th Cir. 1999)).  "Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense."  Id.  The offense for which Delaney arrested Padilla was credit card fraud or identity fraud, based on the discovery of the embossing machine and card stock.  Officer Delaney admitted that he had limited knowledge of such activity which is why he called the Secret Service Agents for consultation.  The Court's observations of Officer Delaney, both on the video of the roadside stop and at the evidentiary

hearing, are that he is a thorough and thoughtful officer who tried at every turn to follow the law as he knew it.  Nonetheless, the Court finds that Delaney went too far in arresting Padilla for credit card or identity fraud on the basis of the evidence before him.

The suspicious activity that Officer Delaney observed consisted of card stock and an embossing machine; conflicting itineraries from Padilla and Guzman; an after-market tracking device in the vehicle; and freshly painted bolts in the vehicle that suggested a hidden compartment.  The court will address each component in turn, but is mindful of the fact that a probable cause determination depends on the totality of the circumstances.  First, there is nothing inherently criminal in the possession of an embossing machine or card stock; those items are used every day for legitimate purposes by, for example, teachers and stationers. Moreover, Padilla told Delaney that he worked in construction and had a plausible explanation for owning the machine and card stock — that he created identification cards for his construction employees.  Had there also been blank credit cards or blank social security cards found with the embossing machine, e.g., United States v. Susini, 261 Fed.Appx. 270, (11th Cir. 2008)(holding police officers had probable cause to seize embossing machine found in plain view during search of home on suspicion of growing marijuana where also found large amount of embossed but not

imprinted credit cards), the Court would be more inclined to find probable cause existed.  In the absence of some other evidence and given Padilla's plausible explanation for the machine, there was nothing here to indicate that the embossing machine was being used for a criminal purpose.

Regarding the conflicting itineraries, though Delaney clearly believed that Padilla and Guzman's statements about their itinerary conflicted, the Court finds that their accounts differed in only minor ways, such as one saying they had been in Atlanta for one day and the other for two days.  Such discrepancies could easily be the result of miscommunication rather than lies (*i.e.*, one person describes a stay of 36 hours as one day while the other describes it as two days).  With regard to the tracking device, though Officer Delaney testified that they are often used in drug trafficking, he also testified that used car dealers use them to repossess vehicles.  The tracking device in and of itself does not indicate criminal activity, much less any particular criminal activity.  Nor does the tracking device bolster Delaney's belief that Padilla was involved in credit card or identity fraud when Delaney testified that its primary criminal use was for drug trafficking.

As to the possible hidden compartment, Officer Delaney never went beyond identifying the bolts and fresh paint that he believed suggested the presence of a hidden compartment — there is no

evidence a compartment actually existed or that it contained contraband.  Once Officer Delaney found the embossing machine and card stock, he stopped searching the vehicle.  Indeed, he could not recall whether he had placed the vehicle on the rack at the barn to look for a hidden compartment, though that was the intended purpose for taking the vehicle there.  Again, the Court is mindful of the fact that probable cause is determined based on the totality of the circumstances, but each of the pieces of evidence collected by Delaney here was relatively innocuous on its own terms and the Court does not find that they add up to sufficient evidence to believe that Padilla had committed or was committing the crime of credit card or identity fraud.  See Zavala, 541 F.3d at 575 (officers' observation of Zavala in suspected drug transaction and Zavala's conflicting answers with passenger upon questioning amounted to reasonable suspicion but not probable cause to arrest).

  2.  *Whether Written Consent to Search Computer Was Valid*
  *Given Arrest Without Probable Cause*

Now that the Court has determined that Padilla was arrested without probable cause, it will proceed to evaluate whether his consent to search his laptop computer was valid given the earlier constitutional violation.[3]  "'Consent to search may, but does not necessarily, dissipate the taint of a fourth amendment violation.'"

---

  [3] The Government relies exclusively on Padilla's consent as
the justification for the search of the computer; it does not
argue that probable cause existed for the search.

Jenson, 462 F.3d at 406 (quoting United States v. Chavez-Villareal, 3 F.3d 124, 127 (5th Cir. 1993)).  To determine whether consent was validly given, this Court must ask (1) whether consent was voluntary and (2) whether it was an independent act of free will. Id.  To determine whether the consent was voluntary, the Court considers: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.  Id.

The Court finds that the fact that Padilla was involuntarily in custody weighs against a finding that the written consent was voluntary here.  Otherwise, the remaining factors weigh in favor of voluntariness.  As discussed earlier, Officer Delaney was professional and courteous throughout his dealings with Padilla and there is no evidence of coercive police procedures by either him or Special Agents Hunter and Bryant.  Moreover, though Padilla objected to going to the car barn and revoked his consent to search the vehicle at that point, he was utterly cooperative with the Secret Service Agents who questioned him and even volunteered that the computer would have relevant information regarding the ID cards that he manufactured for his construction business.  As to Padilla's awareness of his right to refuse consent, the written

consent that he signed indicated that he could withdraw his consent at any time and that it was given voluntarily; thus he was presumably aware that he could refuse to consent. Padilla likely did not believe that incriminating evidence would be found on the computer as the Secret Service Agents were searching for evidence related to the making of ID's and not with respect to child pornography (though it is unclear how open and apparent the child pornography was on the computer). Regarding Padilla's education and intelligence, there is no evidence as to that factor and thus the Court does not consider it. In sum, the Court finds that Padilla's consent was voluntary.

Even where a consent is voluntary, if there has been a preceding constitutional violation, that consent is not valid unless it is also an independent act of free will. Id. at 407. "The purpose of this inquiry is to determine whether there was a 'break in the causal chain' between the constitutional violation and the consent; that is to say, consent cannot be the product of the illegal detention." Id. (citing United States v. Santiago, 310 F.3d 336, 343 (5th Cir. 2002)). To determine whether consent was independent, the Court considers: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct. Id.

Here, the Court finds that all three factors weigh against a finding that the written consent was an act of free will.  Padilla was still being illegally detained at the time that he gave the consent and thus there were no intervening circumstances between the constitutional violation and the consent.   The first two factors clearly weigh against the Government.   United States v. Jones, 234 F.3d 234, 243 (5th Cir. 2000)(noting illegal detention that continued until time of consent meant that the first two factors weighed against consent being independent).   Lastly, the Court finds that the initial misconduct here was flagrant, considering the prolonged detention that Padilla endured on the basis of questionable evidence.   In sum, the Court finds that the written consent, though voluntary, was the product of the illegal detention and not an independent act of free will.   Because Padilla's consent was not valid, the search of his computer violated the Fourth Amendment and the Motion to Suppress must be granted.

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's Motion to Suppress [docket entry no. 12] is **GRANTED**.

**SO ORDERED** this the 24th day of May, 2011.


     s/ David Bramlette

**UNITED STATE DISTRICT JUDGE**